SUNDOR BRANDS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 98–1184.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1998.

Decided Feb. 26, 1999.

516

Terrence J. Nolan argued the cause for petitioner. With him on the briefs was Christopher H. Mills.

Fred B. Jacob, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Fred L. Cornnell, Supervisory Attorney.

Before: GINSBURG, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Local 68 of the International Union of Operating Engineers, AFL–CIO, petitioned the National Labor Relations Board to hold a representation election among certain employees at a plant operated by petitioner Sundor Brands, Inc. Over Sundor's objection, the Regional Director of the NLRB approved a less than plantwide bargaining unit and ordered an election. Sundor appealed the Regional Director's unit determination to the Board, which affirmed. When the Union won the representation election, Sundor refused to bargain with it and was held to have committed an unfair labor practice.

Sundor now petitions for review of the Board's order in the unfair labor practice case on the ground that the underlying bargaining unit determination is unlawful. We hold more narrowly that the Board failed adequately to explain its unit determination. Accordingly, we remand this matter for further proceedings before the NLRB.

## I. Background

In order to understand this controversy one must know something about how Sundor manages its fruit juice beverage plant in South Brunswick, New Jersey. Work there is organized pursuant to a team-based method of management that Sundor calls its "High Performance Work System." Under that system, the Company assigns most of its non-managerial employees each to a so-called team. Instead of giving responsibility for a specific task to a specific individual, the Company assigns all the tasks in a given part of the plant to a team. It may, for example, give a team in the packing department not only the job of operating the packing equipment in its area, but also responsibility for maintaining that equipment and for checking the quality of the product being packed. Sundor expects each of its employees to be able to perform all of the tasks for which his team may be responsible. At least in principle, therefore, the job duties of many employees overlap significantly.

Each newly hired employee starts as a "Level 1 technician" and receives a standard pay and benefit package. A Level 1 technician who demonstrates a mastery of basic operational tasks may bid for a more specialized and better paying Level 2 position. A similar increase in specialization and pay accompanies promotion to Level 3. All non-managerial employees are subject to the same disciplinary rules and standards for promotion, and all use the same parking lot, cafeteria, and smoking room.

Not all non-managerial employees are members of a work team. Of particular relevance here, non-team members include the Maintenance Group Leaders (MGLs), the Level 3 Electrical and Instrumentation Technicians (EITs), and the sole Level 3 Utilities Coordinator (UC).

In March, 1997 the Union petitioned the Regional Director of the NLRB to hold a representation election for a bargaining unit consisting of all full-time and regular part-time Advanced Maintenance Technicians (AMTs), who are team members; and of the EITs and UCs, who are not. Sundor objected to the petition, contending that the employees the Union sought to represent have nothing in common except what they also share with all non-managerial employees. Because of the homogenizing influence of the High Performance Work System, the Company maintained, the only appropriate bar-

gaining unit would include all the nonmanagerial employees in the plant.

After holding a hearing, the Regional Director ordered a representation election for a unit consisting of all AMTs, EITs, UCs, and MGLs. Despite the unusual organizational scheme in the plant, he reasoned, these groups of employees have a community of interest distinct from that of the other employees because they: (1) have specialized skills related to the maintenance of plant equipment; (2) are responsible for the performance of maintenance tasks; (3) spend some part of their working day in the maintenance shop; (4) interact frequently with each other; (5) earn relatively high salaries; and (6) insofar as they do maintenance work, are supervised separately.

Upon Sundor's appeal, the Board generally affirmed but held that, because the Company had raised a substantial objection to their inclusion in the unit, Level 2 UCs should cast ballots marked as challenged. The parties did not receive the Board's order, however, until the election was underway, and four of the five Level 2 UCs had already voted. The Union won the election by a substantial margin and the Board certified it as the exclusive bargaining representative of the employees in the designated bargaining unit.

In order to contest the Board's unit determination, Sundor refused to bargain with the Union. The Board held that the Company thereby violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), and ordered it to bargain. Sundor now petitions for review of the Board's order and the Board cross-applies for its enforcement.

## II. Analysis

■ Under § 9(b) of the National Labor Relations Act, 29 U.S.C. § 159(b), the Board may certify a group of employees as a bargaining unit only if they share a substantial "community of interest." *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262, 1265 (D.C.Cir.1991). To determine whether this standard is met in a particular case, the

Board considers a variety of factors, including the employees' "wages, hours and other working conditions; commonality of supervision; degree of skill and common functions; frequency of contact and interchange with other employees; and functional integration." *Ore-Ida Foods, Inc.*, 313 N.L.R.B. 1016, 1019, 1994 WL 116252 (1994), *enforced*, 66 F.3d 328, 1995 WL 508077 (7th Cir.1995). No one factor is controlling. *See Airco, Inc. v. Chauffeurs & Sales Drivers, Local Union No. 402*, 273 N.L.R.B. 348, 348, 1984 WL 37044 (1984). Upon judicial review the Board's unit determination, if supported by substantial evidence, *see Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1014 (D.C.Cir. 1995), is entitled to "wide deference" from the court. *Willamette Indus., Inc. v. NLRB*, 144 F.3d 877, 878 (D.C.Cir.1998).

### A. Adherence to Precedent

■ Sundor first argues that the unit determination in this case constitutes an improper departure from Board precedent. The Board has generally presumed that a plant-wide unit is appropriate. *See, e.g., Kalamazoo Paper Box Corp.*, 136 N.L.R.B. 134, 137, 1962 WL 16122 (1962).* It follows, according to Sundor, that a smaller unit is presumptively inappropriate, yet the Board failed to consider whether this presumption was overcome in this case.

The argument is without merit. In *American Hospital Association v. NLRB*, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991), the Supreme Court made it clear that the Board may certify any appropriate unit, and is not limited to the "single most appropriate" one. *Id.* at 610, 111 S.Ct. 1539. That a plant-wide unit presumptively would be proper, therefore, has no necessary bearing upon whether a smaller unit also would be proper. Rather, the Board applies the presumption in favor of a plant-wide unit only when the union proposes and the employer opposes such a unit, not when the union proposes a smaller unit. *See, e.g., Airco*, 273 N.L.R.B. at 348–49; *see also American Hosp. Ass'n*, 499 U.S. at 610, 111 S.Ct. 1539 ("[T]he initiative in selecting an appropriate unit resides with the employees" seeking representation).

---

* The Board has created one industry-specific exception to this general principle, but it plainly does not apply here. *See Willamette*, 144 F.3d at 879–80 (Board has consistently approved only plant-wide units in the lumber industry).

■ Nor, Sundor's argument to the contrary notwithstanding, does the Board's general rule conflict with § 9(c)(5) of the Act, 29 U.S.C. § 159(c)(5) ("In determining whether a unit is appropriate . . . the extent to which the employees have organized shall not be controlling"). To be sure, by applying the presumption as it does the Board gives the Union an initial advantage should any conflict ensue regarding the proper scope of the bargaining unit. This modest benefit, however, hardly grants "controlling" weight to the extent the Union has organized the employees. *See NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 441–42, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) (§ 9(c)(5) "was not intended to prohibit the Board from considering the extent of organization as one factor, though not the controlling factor, in its unit determination").

B. Substantial Evidence

■ Sundor's more weighty objection is to the sufficiency of the evidence supporting the Board's unit determination. As noted above, that decision was predicated upon the Regional Director's analysis of six factors. Because there is no suggestion in either the Regional Director's decision or the Board's order affirming it that any of those factors was unnecessary to its decision, we must assume that the Board relied upon each of them. If any one is unsupported by evidence in the record, therefore, the Board must reconsider its unit determination. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based"). *Cf. Fleshman v. West*, 138 F.3d 1429, 1433 (Fed.Cir. 1998) (remand unnecessary where it is clear that agency would have reached the same result had it applied correct reasoning). In the event, we conclude that there is sufficient evidence in the record to support the Board's reliance upon two, and perhaps a third,** of the six factors it invoked; its reliance upon the other three is unjustified.

■ First (in the latter category) is the degree to which the employees in the unit interact with each other. The Board points to testimony suggesting that the MGLs and the AMTs have largely overlapping job responsibilities, and that the AMTs are generally responsible for performing planned maintenance work on production equipment. It also cites evidence that Level 3 EITs regularly work alongside other employees both within the designated unit as well as those excluded from it, and that the "maintenance personnel" attend a monthly meeting.

How the Board could conclude from this evidence that the employees in the unit interact frequently with each other eludes us. That the AMTs and the MGLs may have common job duties does not mean they work together in performing those duties. As to the Level 3 EITs, testimony in the record confirms that they work with other unit employees in "maintenance or trouble-shooting functions" but there is no indication whether they do so with any frequency. The Board's strongest point—but only by default—concerns the monthly maintenance meetings: They show that members of the unit have at least some contact with each other. As Sundor points out, however, the AMTs attend meetings with employees outside the unit not monthly but daily, and the UC interacts most consistently with other utilities employees, not with other members of the disputed unit. Perhaps the monthly maintenance meetings are for some reason so significant that they outweigh the apparently extensive, indeed daily, interaction the AMTs have with employees outside the unit. The Board has not,

** With regard to the unit members' pay, the Board's reasoning is not entirely clear. The Board suggests in its brief that they receive relatively high salaries because they are maintenance employees, but that is not the case. The undisputed evidence shows that Sundor determines its employees' pay exclusively with reference to their experience and skill level; maintenance employees do not earn more than equally skilled and equally senior non-maintenance employees. The Regional Director, however, may have meant only to distinguish unit members, all of whom are Level 3 employees, from non-unit employees, the majority of whom are at Levels 1 and 2. Because the Board is not required to identify the most appropriate unit, but only an appropriate one, *see American Hosp. Ass'n*, 499 U.S. at 610, 111 S.Ct. 1539, a showing that the unit members are better paid than most non-unit employees may provide a degree of support for the conclusion that they have a distinct community of interests. Upon remand, the Board will have to clarify its reasoning if it wants to rely upon this ground.

however, claimed as much, let alone told us why.

■ Second, the Board based its decision in part upon the Regional Director's conclusion that "[a]lthough most of [Sundor's] skilled maintenance employees are members of teams and receive some direction from team leaders, they receive separate direction concerning the performance of their skilled maintenance duties." Again, we fail to see how this factor, on the facts of this case, lends any support to the Board's unit determination. The Board admits—indeed, puzzlingly, seems to assert—that each of the four groups in the bargaining unit, even insofar as they do maintenance work, is supervised separately, and that only two of them (the MGLs and the AMTs) have even one supervisor (the Technology Manager) in common. If, upon remand, the Board is to adhere to its present unit determination, therefore, it must explain why that decision is justified in spite of, not because of, the disparate supervision of the employees in the unit.

■ Finally, the Board asserts that the employees in the unit have the common task of ensuring that equipment at the plant is properly maintained. At least as to the Level 3 UC, however, that claim is grossly overstated. The testimony describing the UC's responsibilities is that he does maintenance work only to fill in for a Level 2 UC who is on vacation or otherwise unavailable; the bulk of his time is devoted to training more junior utilities personnel. Insofar as the Board's decision to include the Level 3 UC is based upon his responsibility for the maintenance of equipment, therefore, it is unsupported by substantial evidence.

In short, three of the six factors upon which the Board relied in reaching its decision are, in whole or in part, without support in the record. In these circumstances, we must remand this matter for the Board to reconsider its decision. In so doing we express no opinion upon the question whether the factors for which there is support in the record could suffice by themselves to support the Board's present unit determination.

C. Late Notice of the Board's Order

■ Sundor maintains that the Board, by failing to inform the parties before voting began that the Level 2 UCs were to cast challenged ballots, unfairly interfered with the election. Employees who voted for the Union believing that it would represent the Level 2 UCs, the Company suggests, may have voted differently had they known that those employees would likely be excluded from the unit.

Whatever the merits of this contention, Sundor did not timely raise it before the Board. Under 29 C.F.R. § 102.69(a), an objection to conduct allegedly affecting the result of a representation election must be made within seven days of the Board's tally of the ballots. Because the Company neither raised its objection in a timely fashion nor alleged special circumstances that could excuse its tardiness, the Board properly declined to consider it.

### III. Conclusion

For the foregoing reasons, the petition for review is granted, the Board's cross-application for enforcement is denied, and this matter is remanded to the Board for further proceedings.

*So ordered.*