# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 8, 2015           Decided August 4, 2015

No. 12-1032

DODGE OF NAPERVILLE, INC. AND BURKE AUTOMOTIVE
GROUP, INC., DOING BUSINESS AS NAPERVILLE JEEP/DODGE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 12-1122

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*James F. Hendricks Jr.* argued the cause for petitioner. With him on the briefs was *Gary L. Lieber*.

*Douglas Callahan*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General at the time the brief was filed, U.S. Department of Justice, *Beth S. Brinkmann*, Deputy Assistant Attorney General, *Scott R. McIntosh*, *Sarang V. Damle*, and *Melissa Patterson*, Attorneys, *John H. Ferguson*, Associate General

Counsel, National Labor Relations Board, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: GARLAND, *Chief Judge*, and MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: The owner of a small car dealership closed the dealership down and informed the six mechanics there – all of whom were union members – that they were expected to continue working at the owner's larger, non-unionized dealership for reduced wages and inferior benefits. After delivering this news, the owner refused to bargain with the mechanics' union over the effects of the move or to otherwise recognize the union in any way. The union filed a charge with the National Labor Relations Board, which ultimately found that the company had committed various unfair labor practices during the relocation. Most critically here, the Board concluded that the company acted unlawfully when it withdrew recognition of the union.

On appeal, the company contends that it had no choice but to withdraw recognition of the union, on the ground that the relocated employees had been absorbed into a larger unit of non-union employees at the new dealership. The company also levies an attack on the Board's composition at the time the decision was issued. Because we conclude that these challenges are meritless, we deny the petition for review and grant the Board's cross-application for enforcement.

3

**I.**

**A.**

This labor dispute unfolded outside of Chicago at two car dealerships owned by Ed Burke: Burke Automotive Group, Inc., doing business as Naperville Jeep Dodge, in Lisle, Illinois; and its subsidiary, Dodge of Naperville, in nearby Naperville, Illinois. (We refer to these dealerships respectively as the Lisle dealership and the Naperville dealership, and collectively as Burke Automotive, or simply Burke.) In early June 2009, the Lisle dealership employed fourteen mechanics, none of whom were unionized, while the Naperville dealership employed six mechanics, all of whom belonged to Automobile Mechanics Local No. 701, International Association of Machinists and Aerospace Workers, AFL-CIO ("the Union"). *See Dodge of Naperville, Inc.*, 357 N.L.R.B. No. 183, 2012 WL 30418, at *1 (Jan. 3, 2012). The Union had represented employees at the Naperville dealership for 20 years. *Id*. at *28.

The Chrysler bankruptcy of 2009 triggered a chain of events that forced Burke Automotive to close one of its dealerships. On June 19, after significant back-and-forth, Chrysler approved a proposal by Ed Burke to continue selling vehicles in Lisle so long as he closed, at least temporarily, the Naperville facility. *Id*. at *13.

On June 20, Burke Automotive shut down the Naperville dealership and notified the six mechanics that they no longer had jobs there. *Id*. at *14, 17. It permitted the Naperville mechanics to work at the Lisle dealership immediately and told them that if they refused employment, they would be viewed as having quit and would be denied unemployment compensation. *Id*. at *1, 17-20. Burke also ceased to honor

the collective bargaining agreement ("CBA") that it had entered into with the Union. *Id.* at \*19. At the Lisle facility, the transferred employees worked alongside the other Lisle employees and under the same supervision. They also were compensated with wages and benefits at the standard Lisle rates, which were considerably less favorable than those set forth in the Naperville employees' CBA. *Id*. at \*2, \*19-20. Two former Naperville employees resigned in light of the inferior terms and conditions imposed. *Id*. at \*35-36.[1]

The Union contacted Burke Automotive and requested the opportunity to bargain over the effects of the move. But Burke refused to recognize the Union, explaining that it no longer represented a majority of mechanics in the bargaining unit. *Id*. at \*18-19.

**B.**

The Union filed charges with the National Labor Relations Board's General Counsel, who subsequently issued a complaint against Burke Automotive. A hearing was held before an administrative law judge ("ALJ") in Chicago on March 15 and March 16, 2010. The ALJ found that Burke Automotive had violated Sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("NLRA") by failing to bargain with the Union about the effects of the relocation on the Naperville mechanics, unreasonably delaying the provision of

---

[1] Although the hourly rate was the same at the two dealerships, at Naperville the mechanics were guaranteed 34 hours of pay a week, provided that they were present at the dealership for 40 hours that week. At Lisle, the mechanics were paid solely for the hours of work that they were assigned and completed, even if they were present in the garage for 40 hours or more. This often resulted in considerably less take-home pay at the Lisle dealership. *Dodge of Naperville*, 2012 WL 30418, at \*16, \*19.

information to the Union, and unlawfully threatening the mechanics against unionizing. *Dodge of Naperville, Inc.*, 13-CA-45399, 2010 WL 3285387 (N.L.R.B. Div. of Judges Aug. 2, 2010). He further found that Burke Automotive had unlawfully withdrawn recognition of the Union as the exclusive representative of the mechanics in the Naperville bargaining unit, unlawfully repudiated the collective bargaining agreement in effect at the time, unilaterally changed the terms and conditions of employment, and constructively discharged the two Naperville mechanics who resigned. *Id.*

The Board affirmed the ALJ's decision, subject to some technical modifications and clarification of the underlying reasoning. The Board also affirmed the ALJ's order directing Burke Automotive to take various affirmative steps, including bargaining with the Union. One of the panel's members dissented with respect to the Board's finding that Burke unlawfully withdrew recognition of the Union.[2] It is primarily this question of withdrawal that Burke presses in its petition for review.

---

[2] Because the dissenting member believed that withdrawal of recognition was proper, he also dissented from the Board's findings that the employer unlawfully informed the Naperville employees that they no longer enjoyed union representation at the Lisle dealership, unlawfully repudiated the CBA, unlawfully imposed unilateral changes without bargaining, and constructively discharged two members. *See Dodge of Naperville*, 2012 WL 30418, at *7 n.3.

6

## II.

### A.

Because the Board has "the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain" under the NLRA, this Court "defers to the Board's 'reasonably defensible' construction of that duty." *Cincinnati Newspaper Guild, Local 9 v. NLRB*, 938 F.2d 284, 286 (D.C. Cir. 1991) (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496-97 (1979)) (internal quotation marks omitted). Any findings of fact made by the Board are conclusive if supported by substantial evidence, "even if a reviewing court on *de novo* review would reach a different result." *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005); *see also Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994) (the Court will uphold an order of the Board unless "it appears that the Board's factual findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue").

### B.

#### 1.

As noted, the Board concluded that Burke Automotive violated its duty to bargain with the Union over the effects of the relocation to Lisle. Although Burke does not challenge this ruling – at least not directly – the ruling bears on other issues raised in the appeal. We therefore pause to discuss the scope of an employer's duty to bargain over the effects of a relocation.

An employer generally is free to make decisions about the scope and direction of its enterprise, including whether to shut down or relocate part of the business. *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 686-88 (1981). The employer must, however, bargain with the union over the *effects* of that decision on the employees represented by the union. *Id.* at 681-82; *see also United Food & Commercial Workers Local 540 v. NLRB*, 519 F.3d 490, 495-96 (D.C. Cir. 2008). "[B]argaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time," *First Nat'l Maint. Corp.*, 452 U.S. at 681-82, which did not occur here. Burke Automotive did not inform the Union of the move until after it happened, and even then refused to engage in any discussions with the Union about the move's effects on the employees.

The range of topics discussed during effects bargaining depends on the nature of the change imposed. When an employer transfers employees from one facility to another, mandatory subjects of bargaining generally include "initial wages, benefits, seniority rights, and working conditions at the new location." *Dodge of Naperville*, 2012 WL 30418, at *3; *see also Holly Farms Corp. v. NLRB*, 48 F.3d 1360, 1368 (4th Cir. 1995) (holding that employer had a duty to bargain with union over the effects of a merger on "wages, hours, work rules, work schedules, and work locations"); *Comar, Inc.*, 349 N.L.R.B. 342, 354 (2007) ("*Comar II*") (noting that bargaining subjects during transfer included "the relocated workers' wages, work locations, schedules, carryover of seniority, and other terms and conditions of employment at the new plant, as well as over the conditions of the transfer").[3]

---

[3] Burke mischaracterizes its duty to bargain to include, at most, the effects of the mechanics' discontinuation of employment. *See* Petitioner's Br. 24. The cases cited by Burke, however, refer to

Burke Automotive therefore was required to bargain with the Union about the former Naperville employees' initial wages, benefits, schedules, and other terms and conditions at the Lisle facility. During such bargaining, the employer was required to consider "any proposals" put forth by the Union on these topics. *First Nat'l Maint. Corp.*, 452 U.S. at 678-79 n.17.

The duty to engage in effects bargaining persists even if the employer's management decision renders the historic unit inappropriate for other purposes. Thus, an employer cannot avoid effects bargaining simply by waiting until after the change has taken place and then claiming that the bargaining unit is no longer viable. *See Comar II*, 349 N.L.R.B. at 354. We affirmed this commonsense principle in *United Food & Commercial Workers Local 540,* where an employer claimed that its duty to engage in effects bargaining was rendered moot by the closure of a facility. We rejected the employer's argument, holding that an "employer's duty to bargain over the effects of a plant closing continues even after the closing: . . . [W]hen a plant closes, an employer cannot escape its effects bargaining duty simply by saying 'No one works here anymore; the bargaining unit has disappeared.'" 519 F.3d at

mandatory topics of bargaining when an employer shuts down a facility and *lays off* the employees. *See*, *e.g.*, *Friedman's Exp., Inc.*, 315 N.L.R.B. 971, 971-72 (1994) (in the context of a plant closure, "it is well settled that effects bargaining encompasses 'issues such as severance pay, seniority, pensions, health insurance, [and] job security' that are of concern to all bargaining unit employees 'whose employment status will be altered by the managerial decision.'") (footnotes omitted). The Board found that Burke's actions constituted a relocation or transfer. *Dodge of Naperville*, 2012 WL 30418, at *3, *20, *24-25. Burke does not expressly challenge this factual finding, which is supported by substantial evidence in any event.

496. Likewise, even if the Naperville bargaining unit merged with the Lisle employees moving forward, the employer retained an obligation to bargain about the relocation's effects on the Naperville employees.

**2.**

The more difficult question – and the one that Petitioner more clearly presses on appeal – is whether the historic Naperville unit became an inappropriate unit for other collective bargaining purposes once those employees were moved to Lisle. This question is critical to the Board's finding that Burke Automotive unlawfully withdrew recognition of the unit. As the Board observed, an employer may lawfully withdraw recognition (for purposes other than effects bargaining) if the union no longer enjoys support from a majority of employees in the relevant unit. *Dodge of Naperville*, 2012 WL 30418, at *2 (citing *Serramonte Oldsmobile,* 318 N.L.R.B. 80, 104 (1995), *enforced in relevant part*, 86 F.3d 227 (D.C. Cir. 1996)).

Burke Automotive argued to the Board that the only appropriate unit was the aggregated group of historic Lisle and former Naperville employees. Burke contended that the old Naperville unit lost its distinct identity when its mechanics began working side-by-side with Lisle employees, and that the merged group formed one (and only one) "community of interest."

The Board rejected this view. It began its analysis, however, by explaining that under other circumstances, the changes made during the relocation would justify recognizing a combined Naperville-Lisle unit, rather than a unit of only former Naperville employees. Specifically, many of the similarities between the two units – the fact that the

mechanics did the same work side-by-side, under the same supervision, for the same wages and benefits – indicated that the units were no longer distinct. *Dodge of Naperville*, 2012 WL 30418, at \*2. The Board further explained that these changes *usually* would constitute the sort of "compelling circumstance" that would justify disregarding a unit with a twenty-year bargaining history. *Id.*

But not so here, where many of the employer's unilateral changes to the former Naperville employees' working conditions – such as reductions in take-home pay and inferior benefits, to conform to the Lisle employees' conditions – were put into place without the required effects bargaining. Because these changes were unlawful, they could be disregarded in the analysis. *Id.* at \*3. Moreover, the Board reasoned, the employer's failure to engage in any sort of effects bargaining "ma[de] it impossible to assess what the terms and conditions of the Naperville employees would have been after the relocation, had the Respondent not acted unlawfully." *Id.* (citing *Deaconess Medical Center*, 314 N.L.R.B. 677, 677 n.1 (1994), and *Holly Farms Corp.*, 311 N.L.R.B. 273, 279 n.25 (1993)). The Board therefore concluded that the changed circumstances did not compel modification of the historic Naperville unit at that time.

We review the Board's determination of the appropriate bargaining unit deferentially, as "the NLRA vests in the Board authority to determine 'the unit appropriate for the purposes of collective bargaining.'" *Serramonte*, 86 F.3d at 236 (quoting 29 U.S.C. § 159(b) (1994)). We recognize that "the Board's discretion in this area is broad, reflecting Congress' recognition of the need for flexibility in shaping the bargaining unit to the particular case." *Id.* (quoting *NLRB v. Action Automotive, Inc.,* 469 U.S. 490, 494 (1985)) (brackets and internal quotation marks omitted); *see also*

*United Food & Commercial Workers Local 540*, 519 F.3d at 494 (Because a determination of an appropriate bargaining unit "requires a fact-intensive inquiry and a balancing of various factors, the Board has broad discretion in making the determination; we have said its decision is entitled to wide deference.") (internal quotation marks omitted). We also have long observed that "the Board need only select *an* appropriate unit, not *the most* appropriate unit." *Serramonte*, 86 F.3d at 236 (emphasis in original) (brackets and internal quotation marks omitted).

When determining whether a smaller bargaining unit is appropriate, as opposed to a larger unit, the Board looks to whether there is a "community of interest" among the employees. *United Food & Commercial Workers Local 540*, 519 F.3d at 494 (internal quotation marks omitted). In doing so, the Board considers factors such as "'the employees' wages, hours and other working conditions; commonality of supervision; degree of skill and common functions; frequency of contact and interchange with other employees; and functional integration.'" *Id.* (quoting *Sundor Brands, Inc. v. NLRB*, 168 F.3d 515, 518 (D.C. Cir. 1999)); *see also Home Depot USA*, 331 N.L.R.B. 1289, 1290 (2000) (mentioning these factors, as well as "employment benefits," "amount of working time spent away from the employment or plant situs," and "history of bargaining").

The traditional community of interest analysis may be modified under particular circumstances, and two such modifications are relevant here. First, the Board is reluctant to alter a historical relationship between a unit and its union, and it therefore gives significant weight to a unit's bargaining history. Specifically, the Board demands that a party challenging a historical unit show that "compelling circumstances" warrant modification of the unit. *Trident*

*Seafoods, Inc. v. NLRB*, 101 F.3d 111, 118 (D.C. Cir. 1996); *ADT Security Servs.*, 355 N.L.R.B. 1388, 1396 (2010). Second, when evaluating the community of interest factors, the Board ignores any impermissible changes made unilaterally by the employer (for example, changes made without effects bargaining, if that was required). *In re Comar, Inc.*, 339 N.L.R.B. 903, 911 (2003) ("*Comar I*") ("To hold otherwise would allow [the employer] to benefit from its own unlawful conduct."), *enforced*, 111 F. App'x 1 (D.C. Cir. 2004); *Holly Farms Corp.*, 311 N.L.R.B. at 279.

The Board applied these legal principles when it concluded that Burke Automotive had failed to establish compelling circumstances that would justify disregarding the historic Naperville unit. Burke argues that this conclusion was erroneous for various reasons. For the following reasons, all of Burke's arguments must be rejected.

Burke Automotive first argues that the NRLB applied a "new standard" when it applied the "compelling circumstances" test discussed above. Petitioner's Br. 3, 26. Burke is incorrect about the novelty of the "compelling circumstances" test. As noted, the Board has repeatedly held that a historical bargaining unit remains appropriate absent a showing of "compelling circumstances," as this Court has recognized. *Southern Power Co. v. NLRB*, 664 F.3d 946, 951 (D.C. Cir. 2012) (discussing "compelling circumstances" standard); *Cmty. Hosps. of Cent. California v. NLRB*, 335 F.3d 1079, 1085 (D.C. Cir. 2003) (same); *Trident Seafoods,* 101 F.3d at 118 (same).

Burke next argues that the Board should have applied an "accretion" doctrine. "Accretion is the addition of a group of employees *to an existing union-represented bargaining unit* without a Board election." *Dean Transp., Inc. v. NLRB*, 551

F.3d 1055, 1067 (D.C. Cir. 2009) (emphasis added).[4]  The Board has not applied the doctrine where, as here, the larger unit was not organized and had no bargaining representative. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1077 (D.C. Cir. 2007).  Rather than relying on the accretion doctrine, the Board framed its decision in accordance with its presumption against disturbing a historical bargaining unit. This was consistent with Board precedent.

Burke also contends that the Board's decision in *Brown Truck & Trailer Manufacturing Co.*, 106 N.L.R.B. 999 (1953), establishes that a historical union cannot bargain over the terms and conditions of unit employees at a new facility where non-unit employees work.  *See* Petitioner's Br. 25. Burke's assertion misconstrues the case.  *Brown Truck* merely stands for the proposition that a bargaining unit that is transferred to another facility cannot bargain over the terms and conditions of employment for *all* of the employees at the new facility.  106 N.L.R.B. at 1002.  This principle – that a union cannot bargain over the terms and conditions of employment for employees it does not represent – is a core tenet of labor law.  *See Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 736-37 (1961) (holding that a union cannot represent a group of employees for which it does not enjoy majority support).  But it is inapposite here, where the Board was simply considering whether the Union could continue representing the six former Naperville employees.

---

[4]  When considering whether a smaller unit has been accreted into a larger unit, the Board evaluates whether the two merged units form an "overwhelming community of interest."  *Safeway Stores, Inc.*, 256 N.L.R.B. 918, 918 (1981).  Even if accretion were relevant here, it is not clear whether this standard is meaningfully different from the "compelling circumstances" test.

14

It is only Burke Automotive's last argument that gives us pause. Burke questions whether, even if it had engaged in effects bargaining with the Union, any changes made with respect to mandatory bargaining topics would have been sufficient to maintain the distinctness of the historic Naperville and Lisle units. Burke points out that in other cases where the Board has refused to disturb a historical bargaining unit after a relocation or merger, additional factors beyond wages and benefits indicated that the historical unit remained distinct. For example, in *Comar II*, the Board found that changed circumstances did not compel disregarding a historical bargaining unit where an employer relocated a group of employees from one facility to another but kept the two sets of employees at the new facility separate from each other and under different supervision. 349 N.L.R.B. at 360; *see also ADT*, 355 N.L.R.B. at 1388-89 (finding no compelling circumstances, despite merger of two units of service employees, where each set of employees retained different terms of employment, including – unlike here – different primary work locations).

Although this is a tougher call, we conclude that the Board's decision was supported by substantial evidence and that it was not arbitrary. It is clear that the Naperville employees could have bargained for "wages, hours and other working conditions" that were different from those of the Lisle employees and were more consistent with the terms outlined in the CBA; this weighs against finding a community of interest. Moreover, the bargaining process is a flexible one, where an employer is obligated to consider in good faith "any proposals" submitted by the union. *First Nat'l Maint. Corp.*, 452 U.S. at 678-79 n.17. Although Congress has limited mandatory subjects of bargaining "to matters of 'wages, hours, and other terms and conditions of employment,'" an employer and a union sitting down at the

bargaining table "are free to bargain about any legal subject." *Id*. at 674 (quoting 29 U.S.C. §§ 158(d) and 158(a)(5)). Burke and the Union could have agreed to other changes that would have led the Naperville employees to have, for example, distinct supervisors or spheres of work from the Lisle employees. There is uncertainty about what the relocation would have looked like had effects bargaining taken place, and the Board found that it would be unfair to permit Burke to benefit from the uncertainty created by its unlawful refusal to bargain. In view of the "wide deference" accorded to the Board, *United Food & Commercial Workers Local 540*, 519 F.3d at 494, we cannot say that this was error.

We note, however, that our decision is limited to these particular facts. We might have reached a different conclusion had effects bargaining taken place and resulted only in modest differences between the two groups in wages and benefits. The Board itself has noted that it can be unworkable to continue recognizing a union representing only a historic bargaining unit if unit employees are working side-by-side with non-unit employees. *See Abbott-Northwestern Hosp.*, 274 N.L.R.B. 1063, 1067 (1985) (recognizing the potential difficulty in having unit and non-unit employees working alongside each other, performing the same jobs). It may turn out that Burke's withdrawal of recognition was simply premature – but premature is still improper. We therefore uphold as reasonable the Board's conclusion that Burke Automotive unlawfully withdrew recognition of the Union when it did so immediately upon the relocation, prior to any effects bargaining.

## C.

Burke Automotive also challenges the Board's decision by attacking the composition of the Board itself. Burke

argues that the Board was operating with only two valid members at the time that the decision was issued, and that the Board consequently lacked the requisite quorum. According to the employer, the Board's opinion is therefore invalid. *See New Process Steel v. NLRB*, 130 S. Ct. 2635, 2640-42 (2010) (holding that the Board cannot render decisions when its membership falls below three).

The Board's opinion was issued on January 3, 2012. It is undisputed that on that date, the three members that issued the opinion – Chairman Mark G. Pearce, Member Brian Hayes, and Member Craig Becker – were the only individuals acting as Board members at that time. It also is undisputed that the appointment of Craig Becker (who was recess appointed in the second session of the 111th Congress) expired at the end of the first session of the 112th Congress. *See* U.S. Const., art. II § 2, cl. 3 ("[The President] shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.").

Burke Automotive argues that Becker's appointment ended on December 17, 2011, when the Senate agreed to adjourn and convene for *pro forma* sessions only every Tuesday and Friday between that date and January 23, 2012. According to Burke, this action triggered the end of the session and the beginning of an inter-session recess.

This argument has no merit. *See D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 352-53 (5th Cir. 2013) (rejecting the same argument regarding Member Becker's service). The Supreme Court recently observed that the end of an annual session is triggered by a recess only if the Senate adjourns *sine die* – that is, without specifying a date to return. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560-61 (2014) ("The Senate

or the House of Representatives announces an inter-session recess by approving a resolution stating that it will 'adjourn *sine die*,' *i.e.,* without specifying a date to return (in which case Congress will reconvene when the next formal session is scheduled to begin)."). Because the Senate convened every few days after December 17, the short recesses that took place were *intra*-session recesses – in other words, the prior session did not end. The first session of the 112th Congress instead ended at noon on January 3, 2012, when the second session began. *See* U.S. Const., amend. XX, § 2 ("The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day."); *D.R. Horton*, 737 F.3d at 352 ("Because there was no *sine die* adjournment on an earlier date, one Senate session ended on January 3, 2012, immediately before the next session began at noon.").

In its reply, Burke suggests (without any evidence or argument) that perhaps the Board's order issued after noon on January 3, 2012, after Becker's appointment expired. Because we do not consider arguments raised for the first time on reply, we do not address this argument. *Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 30 (D.C. Cir. 2001).[5]

---

[5] Burke Automotive also contends that the Board abused its discretion in issuing an affirmative bargaining order. *See* Petitioner's Br. 38. Although the affirmative bargaining order originated with the ALJ, Burke did not object to the nature of that order before the Board and has not explained its failure to do so. We therefore lack authority to consider its objection here. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999) ("A court of appeals altogether 'lacks jurisdiction to review objections that were not urged before the

## III.

For the foregoing reasons, we find no error in the Board's conclusions with respect to Burke Automotive's unlawful withdrawal of recognition. We also reject Burke's other challenges to the Board's decision. We therefore deny Burke's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

Board.'") (quoting *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665-66 (1982)).